HENRI JACQUIN, Respondent, v. PAULINE BOUTARD and Others, Appellants.

*Contract for sale of goods on a commission — sales made during its continuance deliverable thereafter — when the court will imply a promise not specified in the contract.*

Upon the trial of an action brought to recover damages resulting from an alleged breach of contract, it appeared that the plaintiff had been employed by the defendants' firm to take entire charge of their business in the United States, the contract enumerating the duties to be performed by the plaintiff and providing that the defendants should place in the plaintiff's charge all orders for goods payable in currency in the United States, and pay him for his services as agent a commission on all collections in currency on orders placed by salesmen employed directly by the defendants or by salesmen employed by the plaintiff. The parties entered upon the performance of their respective obligations and proceeded without misunderstanding until the defendants, in accordance with a stipulation in the contract, gave notice of its termination at the end of six months, and after giving such notice refused to send to the plaintiff samples and price lists of their goods necessary to enable the plaintiff's salesmen to make sales. The defendants also withdrew the salesman from the United States who had theretofore represented them, and put in his place another one, directing him to sell no goods payable in currency in the United States, but to make all sales payable in francs.

*Held*, that the plaintiff was entitled to commissions upon goods sold during the existence of the contract but deliverable afterwards;

That he was entitled to sell defendants' goods whether the defendants desired him to do so or not, so long as the contract remained in force;

That although there was no express promise in the contract that the defendants would furnish the plaintiff with samples and price lists, yet such promise would be implied from the facts and circumstances surrounding the execution of the contract and the conduct of the parties thereunder.

The defendants claimed that they were not bound to sell any specified amounts in currency, or to sell through the plaintiff at all, but that the contract simply provided that they should deliver through him all goods sold in currency in the United States.

*Held*, that while the contract only provided for a commission to be paid to the plaintiff upon all goods sold in currency in the United States, there was no suggestion in it that the defendants reserved the right to sell goods in the United States in francs, and that they could not deprive the plaintiff of his right to compensation by directing their salesman to sell goods only in francs.

APPEAL by the defendants, Pauline Boutard and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in

the office of the clerk of the county of New York on the 21st day of February, 1895, upon the verdict of a jury rendered after a trial at the New York Circuit, and also from an order entered in said clerk's office on the 19th day of February, 1895, denying the defendants' motion for a new trial made upon the minutes.

*George A. Strong,* for the appellants.

*Charles E. Hughes* and *Edward F. Dwight,* for the respondent.

PARKER, J.:

The contract created by the correspondence of the parties required the plaintiff to furnish at his own expense a suitable office in the city of New York bearing defendants' firm name, with proper storage space, for ordinary office purposes and, also, for the display of samples of defendants' fabrics and for the convenience of customers and salesmen; to take charge of all orders for delivery in the United States; to attend to all matters connected with the passage of merchandise through the custom house and its shipment and delivery to purchasers; to enforce conditions of sale; to advise defendants' bankers as to terms; to control salesmen, whether appointed by plaintiff or defendants; to supervise credits, plaintiff having the right to reject orders by parties of doubtful responsibility, and underwriting collections to the extent of his commissions; to facilitate by all means in plaintiff's power the sale of defendants' goods; and to devote to defendants' American business the same care and watchfulness which defendants themselves would give to it were they established at New York. It provided that defendants should place in plaintiff's charge all orders for goods payable in currency in the United States, and pay him for his services as agent a commission on all collections in currency on orders placed by salesmen employed directly by defendants of two and one-half per cent, and in case of orders placed by salesmen employed by plaintiff of five per cent, with a reduction of one-half per cent in each case if the yearly sales amounted to more than $150,000.

Upon the strength of this contract, as modified by subsequent correspondence between the parties, the plaintiff employed on his own account a salesman, to whom he paid $100 per month, and in addition a fixed commission on goods sold by him. The parties entered

upon the performance of their respective obligations shortly after an agreement had been reached, and proceeded without any misunderstanding or question until July 4, 1892, when the defendants, in accordance with the stipulation in the contract, gave notice of its termination at the end of six months.

Having given this notice, they refused to send samples to the plaintiff, which were necessary in order to enable the salesman employed by him to make sales of defendants' goods. They also withdrew the salesman from the United States who had theretofore represented them, and sent in his place another salesman, whom they instructed not to sell any goods payable in currency in the United States, but instead to make all sales payable in francs. By this means they sought to terminate, so far as they were concerned, all obligations on their part under this contract, while the plaintiff necessarily remained bound under it to provide an office and a storage place for the reception of their goods for a further period of six months. And if their contention as to the construction which should be put upon this contract be well founded, then the contract under which plaintiff was bound to, and did incur expense in a substantial amount, did not place upon the defendants a corresponding obligation to afford the plaintiff an opportunity to earn the commissions by which this expense could be borne and his own services compensated for.

The defendants' position, as stated in the brief of their counsel, is, that " defendants not only did not agree to sell any specified amount in currency, but they did not bind themselves to sell at all through plaintiff.

" The contract is simply that they will deliver through him all goods sold in currency in the United States. They remain on the face of the contract free, and they clearly intended to remain free, to sell in currency or in francs, or not to sell at all, as they might thereafter find to their advantage."

It may be observed, in the first place, that while the contract only provides for a commission to be paid to the plaintiff upon all goods sold in currency in the United States, there is no suggestion in it, or in any of the correspondence between these parties, that the defendants reserved the right, or intended, to sell goods in the United States in francs. Nor does it appear that defendants did

sell any goods in francs, from the time of the making of the con-tract down to July, 1892, when they notified plaintiff that they elected to terminate the contract on the 1st day of January, 1893. Then, for the first time, defendants suggested the position which they now insist upon, that having agreed to pay plaintiff for his services and expenses only by commissions upon goods sold in cur-rency, they had the right to deprive him of all reimbursement and compensation by directing their salesman to sell in francs, and refus-ing the plaintiff samples, so that he and the salesman employed by him could not sell at all.

The language of the contract and the correspondence between the parties subsequent thereto and their conduct thereunder, satisfies us that the parties did not so understand it at the time of the making of the contract. That it was a mere afterthought of the defend-ants, born of a desire to relieve themselves from the payment of the commissions which performance of the contract for the ensuing six months, as theretofore, would entail.

The questions involved, therefore, lead to the ultimate determi-nation whether or not this contract was so drawn as to continue in full force as to the plaintiff without any corresponding obligation or duty on the part of the defendants.

The first question which suggests itself is whether the plaintiff would be entitled to commissions upon goods sold during the life of the contract, but deliverable afterwards. For it is the fact that the character of the business done under the contract was such that a large part of the sales made in the fall of 1892 would, in the ordi-nary course of business, not have been delivered until after January 1, 1893. While this question relates to the measure of damages, it is, nevertheless, a substantial one, for unless the plaintiff is entitled to recover compensation for goods sold prior, but delivered subse-quently, to the expiration of the contract, the judgment must be reversed, because of the refusal of the court to charge a request upon that subject preferred by the counsel for the defendants.

The compensation to be paid to the plaintiff for keeping an office, putting defendants' firm name upon the door, supervising credits, underwriting his commissions, directing the salesmen and superintending the delivery of the goods was a commission on the net sums paid in currency.

It is evident that under the contract the plaintiff's commissions were intended to be calculated according to the year's business, and payment thereof was intended to be made when the net sum should be paid in currency. If this be not the proper construction, then it is apparent that no matter how long the contract may have continued plaintiff would have had six months' work without pay, during which time he would necessarily be under a substantial expense, and, in addition, be liable over to the defendants to the extent of his commissions upon any orders taken for which payment should not be made by the purchasers. For it will be remembered that it was the duty of the plaintiff under the contract to supervise credits, and to reject orders if not satisfied with the purchasers' responsibility, the effect of a mistake upon him being not only the loss of commissions, but in addition a liability to defendants in a sum equal to his commissions on such orders. As this duty of supervision continued under the contract until its termination, it is clear that the liability which guaranteed its faithful performance likewise remained, and this liability, as we have observed, was in each case equivalent to the stipulated commissions. It would seem to follow that if plaintiff had taken any orders, or defendants had sold goods deliverable in the United States during that period, the plaintiff would have been entitled to compensation. It may be observed in passing that this conclusion would sustain the decision of the trial court in holding that the defendants broke the contract, for their representative Pike, while endeavoring to execute their commands to sell only in francs, failed as to two customers who refused to take the goods except on a delivery in the United States. These deliveries were not made through plaintiff, as the defendants were bound to do, even according to their own construction of the contract, and knowledge of such deliveries was kept from the plaintiff. But we shall not dwell upon this, for, unless the defendants were bound to furnish to the plaintiff samples for the use of himself and his salesman to enable them to make sales deliverable in the United States, the judgment must be reversed because of the refusal of the court to charge certain requests preferred by the defendants.

Having reached the conclusion that the plaintiff would have been entitled to recover commissions had the defendants furnished him

with the opportunity to make sales as they did previous to the notice of termination, we shall now inquire whether plaintiff was entitled, as a matter of right under the contract, to make sales whether defendants desired him to do so or not. And in speaking of the plaintiff in that connection, we include the salesman acting under his supervision. It is defendants' contention that, under the contract, they had the right, at any time during the life of it, to stop plaintiff from selling goods in currency. In other words, that while the contract concededly bound plaintiff, until its termination, to keep an office and do all the other things specified therein, including the rendition of such personal services as should be necessary according to defendants' letter to "facilitate, by all means in your power, the sale of our goods. * * * In short, we expect you to devote to our American business the same care and the same watchfulness which we ourselves would give to it if we were established in New York," nevertheless, defendants could prevent the plaintiff from taking any orders deliverable in the United States. And this, notwithstanding the fact that the entire scheme of the contract seems to have been to constitute plaintiff the defendants' agent in the United States for the sale of their goods, without any intimation therein that it was defendants' purpose to make sales within such territory through any other channel or in any different manner. A test of this contention is furnished by the inquiry: Suppose plaintiff had taken orders upon proper terms during the period in question, notwithstanding the defendants' efforts to deprive him of the means of doing so, would he have been entitled to insist upon the acceptance of such orders, or upon the payment of commissions as though they had been accepted? This inquiry has sufficient answer in *Taylor* v. *Morgan's Sons Company* (124 N. Y. 184). In that case, plaintiff was employed as a traveling salesman to sell defendants' sapolio in specified States. He was required to travel over his route six times a year, to handle no goods in conflict with theirs, to conduct himself and the business in a manner to their general satisfaction, for which they agreed to pay commissions "upon all orders accepted from *bona fide* purchasers." After his discharge, he brought an action to recover his commissions, and was allowed by the referee commissions upon orders from responsible parties, which the defendants did not accept. In sustaining the judgment, the court said: "We incline to the view

that it was the duty of the defendants to accept all orders presented by the plaintiff from *bona fide* purchasers, which were made in accordance with the provisions of the contract, and that they did not have the right, without cause, to arbitrarily refuse to accept such orders. Such a construction of the contract would require the plaintiff to travel over the territory mentioned at his own expense, six times a year, with a right on the part of the defendants to reject every order presented by him, and to thus deprive him of any commissions."

So, under this contract plaintiff assumed duties of considerable magnitude, for which he was to be compensated by commissions upon sales made during its lifetime; certainly defendants cannot insist upon a performance of those duties, and yet arbitrarily and capriciously refuse to plaintiff an opportunity for compensation by placing orders.

It seems a fair and reasonable construction of the contract that, subject to the reasonable requirements of defendants' business, plaintiff, in person or through his salesman, was entitled to make sales so long as the contract continued in full force. If that be sound then surely it cannot be said that the contract did not in any way bind defendants to make any part of their sales in currency. For aside from the fact that the contract in no wise suggested that it was the purpose of the defendants during its existence to make sales in any other way or manner, they were bound to accept such orders as the plaintiff should obtain personally, or through his salesman, and to such extent, at least, they were obligated to continue the business of making sales deliverable in the United States, through plaintiff's agency.

We now come to the question whether defendants during the period in question had the legal right, under the contract, to withhold from the plaintiff the samples and price lists as they did do, thus rendering it impossible for him to continue the business in the United States, and secure compensation for the services rendered and expenses incurred by him. We have said that they could not have refused to accept orders, had plaintiff been able to obtain them on proper terms, and the inquiry now is, whether under this contract they could do indirectly what they could not do directly? The claim of the defendants is that there is no express provision of

the contract requiring them to furnish samples and price lists, and that they cannot be charged with a breach of the contract except by holding that such a provision should be implied, and they deny the authority of the court to make such implication in this case. Preliminarily to a consideration of the legal question involved, we should ascertain, if possible, from the contract, considered in the light of the facts and circumstances surrounding its making, and the subsequent acts of practical construction put upon it by the parties, whether it was their intention that the defendants should furnish to the plaintiff samples and price lists for the purpose of carrying on the business which occasioned the making of the contract. It is undisputed·that both parties knew that it was an utter impossibility for the plaintiff to accomplish the object, which both parties had in view, unless he was furnished from time to time with samples and price lists of the goods which it was the defendants' aim to sell in the United States. And it is difficult to conceive that either one of the parties could have purposely intended keeping such a provision out of the contract. Undoubtedly the defendants then intended to furnish them, and of course the plaintiff could not conceive that the defendants could have any purpose in withholding them at any time. While the express provision on this subject was not contained in the informal correspondence, which constitutes the contract, still, a consideration of the language employed and the conduct of the parties, indicates to us that it was their intent, at the time of its making, to bind the defendants to furnish the plaintiff with samples and price lists, so that "'he might facilitate their sales' and have full power to 'successfully conduct their American business.'"

The very first letter provides that the plaintiff should preserve the defendants' collection of samples, and the circular sent to customers, as soon as the business was begun, informed them that they would find samples at plaintiff's address.

At the very beginning of the business, and on March 10, 1891, plaintiff, in writing to the defendants, said : " We will keep you as much as possible informed of everything happening in the market, and, if necessary, will cable you when we think it worth while. I hope that the cases of Henrietta sample pieces are on the road." Ten days later the defendants replied : We " will neglect no occasion

to extend the business conducted through your intermediary. We are able to put en route all the samples which you asked, and hope that they will reach you in time to obtain orders."

Other letters, announcing the sending of samples and patterns with the promise of more to follow, were sent to the plaintiff, and it is conceded that, until the notice to terminate the contract was given, all the samples necessary for the conduct of the business were furnished.

In a letter of April 22, 1892, the defendants, after informing the plaintiff that he was considered responsible for the acts of Boullon as well as for those of Kennedy, continued : " You will understand, perfectly, the motive which actuates us. Desiring to give you all authority for successfully conducting our American business, we cannot delegate any part of it to whoever it may be." Indeed, the defendants stipulated upon the trial that, from the making of the contract down to the notice of termination, the defendants sent to the plaintiff samples of each season's fabrics regularly and in due course. Thus, it appears from the acts of the parties that they understood it to be the duty of the defendants to furnish the plaintiff with samples and price lists. Now, it has been often held that the practical construction put upon a contract by the parties to it is sometimes almost conclusive as to its meaning, for there is no surer way to find out what parties meant than to see what they have done. (*Insurance Company* v. *Dutcher,* 95 U. S. 273 ; *Woolsey* v. *Funke,* 121 N. Y. 92 ; *Nicoll* v. *Sands,* 131 id. 24.)

These authorities are not of course controlling in this case, for the contract contains no provision whatever on the subject now under discussion, but they serve to show the importance which the courts justly attach to the conduct of parties under a contract, and are serviceable, as aids, in determining whether the parties intended to agree that samples and price lists should be furnished by the defendants, although they did not express it in the contract, and whether it was so understood by both of them. And thus considering the conduct of the parties under this contract, and the contract itself in the light of the facts and circumstances surrounding its making, we reach the conclusion that the parties understood that it was a part of their agreement that the defendants should furnish to the plaintiff samples and price lists, and that its failure to appear in the contract was not an intentional omission, but a mere inadvertence.

The evidence is of such a character as to support such a finding of fact, and it must be assumed in the disposition of this case that it was so found by the trial court.  And this is so, because, while there was a jury, both parties requested the direction of a verdict, which left the court free to decide all questions of fact.  It would seem to follow that in such a situation the court should imply a promise to furnish samples and price lists.  While the courts hesitate to imply promises in formal contracts, it will be done where otherwise the manifest intention of the parties will be defeated. Reference will be made to a few of the cases in which the courts have implied promises by one of the parties to the contract.  In *New England Iron Company* v. *Gilbert Elevated R. R. Company* (91 N. Y. 153) the plaintiff agreed to perform the labor and furnish the material necessary to the erection of an elevated railway, and to commence its erection at a point to be named by the defendant, and at such time as the president should notify it that defendant's capital stock was subscribed for.  The contract did not provide that defendant should give the notice required to set plaintiff in motion. The court held that the promise to give the notice on the part of the defendant should be implied.  In *Mansfield* v. *N. Y. C. & H. R. R. R. Co.* (102 N. Y. 205) the plaintiff agreed to construct for the defendant the superstructure of an elevator upon foundations to be prepared by the defendant, the work to be commenced within five days after the defendant's engineer should notify plaintiff to proceed with the work.  When the notice was given the foundations were not completed.  The contract, it appears, did not contain a covenant on the part of the defendant that it would have the foundations in condition to enable the contractors to go on with their work before giving notice, but the court held that such a covenant was clearly to be implied.  In the course of the opinion the court said :  " The meaning of a contract is to be gathered from a consideration of all of its provisions, and the inferences naturally derivable therefrom, as to the intent and object of the parties in making it and the result which they intended to accomplish by its performance.  It was said by ALLEN, J., in *Booth* v. *Cleveland Mill Co.* (74 N. Y. 15, 21):  'There is no particular formula of words or technical phraseology necessary to the creation of an express obligation to do or forbear to do a particular thing or

perform a specified act. If from the text of an agreement and the language of the parties, either in the body of the instrument or in the recital or references, there is manifested a clear intention that the parties shall do certain acts, courts will infer a covenant in the case of a sealed instrument, or a promise if the instrument is unsealed, for non-performance of which an action of covenant or *assumpsit* will lie.' "

In the recent case of *Genet* v. *D. & H. C. Co.* (136 N. Y. 593) a question was presented under entirely different circumstances from those now before the court, but the court implied a promise that the defendant would not " willfully or negligently incapacitate itself" from taking out more than the minimum quantity of coal during the year. The argument of the court upon this subject contains the following : " And now the defendant claims that the contract is unbroken so long as it pays the minimum royalty   It is abundantly disclosed that the plaintiff is not getting, can never get, what she would have received, what she expected to receive, what was the chief inducement to the contract, what the lessee expected to pay, and what in the ordinary course of business it would have paid, solely because of the negligent destruction of the mine. The loss has come from a cause which both parties assumed would not occur, and against which, for that reason, the lessor took no express covenant, and it is because the lessee did not expressly covenant that it would not willfully or negligently incapacitate itself from taking out more than the minimum quantity of coal per year that it grounds its contention. There is no such express stipulation, but I think one is to be implied, and fairly and justly may be found interwoven with the terms expressed and growing out of their scope and meaning."

The court cited with approval, and by way of illustrating its argument, the case of *M'Intyre* v. *Belcher* (14 C. B. Rep. [N. S.] 654). The language of the court in considering the *M'Intyre* case so accurately describes the situation presented by this case that we quote it.

In *M'Intyre's* case " the plaintiff sold out his business as a surgeon, getting in return a cash payment for his drugs and instruments of about seventeen pounds, but taking an agreement that the purchaser would account for and pay over to the plaintiff the one-fourth

part of the receipts of the business for four years, if he should live so long, provided that their annual aggregate should reach three hundred pounds. The defendant during the third year chose to abandon the business and the plaintiff sued. There was no express agreement that the purchaser would continue the business, or that if he did, that its annual proceeds should reach three hundred pounds. The court held that a covenant was implied that the defendant would not willfully incapaciate himself from carrying on the business. Of course, the plaintiff took the risk, beyond the payment in cash, of the defendant's business capacity, of his tact and skill, of his industry and ability to gather in more than the annual three hundred pounds, but the risk he did not take was of the willful or negligent abandonment by the defendant of any effort to do business at all, so that the earning of profits was rendered utterly impossible."

Another case, more clearly analogous, may be found in *Turner* v. *Goldsmith* (L. R., 1 Q. B. [1891] 544). There defendant, a shirt manufacturer, by contract in writing, agreed to employ plaintiff to serve as canvasser and traveler on the terms : *First*, that the agency should be terminable by either party at the end of five years by notice; *second*, that the plaintiff should do his utmost to obtain orders for the goods manufactured by the defendant as should, from time to time, be furnished or submitted by sample or pattern, plaintiff's compensation to consist of a commission upon receipts from sales. Two years thereafter defendant's manufactory was burned down. Plaintiff brought his action for breach of contract. It was defendant's position that he was not bound to continue business, and that in any event the agreement did not contain a stipulation that he should furnish samples, and, therefore, there was no obligation on his part to do what was necessary to enable plaintiff to earn his commission. To this contention the court responded : "The answer to that is that the company would not be employing the plaintiff, within the meaning of the agreement, unless they supplied him with samples to a reasonable extent."

Plaintiff's recovery was, therefore, sustained. It is our conclusion that the court should imply a promise on the part of the defendants to furnish the plaintiff with the necessary samples and price lists, and it follows that the judgment should stand.

Judgment affirmed, with costs.

VAN BRUNT, P. J.:

As the courts have adopted the rule of supplying supposed omissions in contracts I concur.

FOLLETT, J., concurred.

Judgment affirmed, with costs.