**1.** New York Stock Exchange—Insolvency of Member—Sale of Member-ship—Distribution of Proceeds.

The constitution of the New York Stock Exchange provides for the disposition by the committee of admissions of the membership of a suspended member on his failure to settle with his creditors within one year from the time of his suspension, and for the application of the proceeds to the payment of his "debts in the exchange," and to the "claims filed by other creditors who are members of the exchange." A member suspended for insolvency transferred his membership in blank within one year thereafter to the committee on admissions, who sold the same. Held, that the proceeds, notwithstanding the prior general assignment made by the firm of the member and its individuals, were primarily liable to the payment of the debts which he and his firm had contracted with members of the exchange, and also to the debts of that character due partnerships, a member of which was also a member of the exchange.

**2.** Same—Constitution—Construction.

Where the constitution of the New York Stock Exchange was ambiguous as to the disposition of the proceeds of a membership of an insolvent member, where a debt was due to a firm a member of which was a member of the exchange, usage, as well as the practical construction put upon the constitution by the parties thereto, may be proven in order to give the effect intended thereby.

**3.** Same—Effect of General Assignment.

A general assignment by an insolvent member of the New York Stock Exchange does not affect the contractual rights which members of the exchange have in the membership, so that dividends paid them as creditors out of the sale of the insolvent member's membership are not to be deducted in determining the amount for which they are entitled to dividends out of the assigned estate.

**4.** Assignment for Benefit of Creditors.

On an assignment for benefit of creditors, the rights of all creditors are to be determined as of the date of the assignment.

In the matter of the final accounting of Alfred Hayes, Jr., assignee of Frederick W. Johnson and Henry A. Seymour for the benefit of their creditors. Motion for modification, and confirmation as modified, of the report of the referee stating the account of the assignee. Exceptions to report of referee sustained.

Coudert Bros., for assignee.
Simpson & Werner, for Henry Sudorf.
Melville Egleston, for American Telephone & Telegraph Co.
Beardsley & Hemmens, for Anthony N. Brady.
Henry D. Donnelly, for Chester Scott.
Mandelbaum Bros., for J. M. Fortier.
Henry Wellman, for James J. Townsend and others.
McKoon, Luckey & Schwartz, for George G. McChesney.
Albert P. Massey, for Irving T. Jones and another.
Pierre M. Brown, for Charles A. Mumford.

FITZGERALD, J. The issues presented to the court upon this motion for the modification, and confirmation as modified, of the report of a referee taking and stating the account of an assignee, are those raised by the findings of the referee, and by the exceptions thereto: (1) Of the claimant Mumford; (2) of the assignee, as the trustee for the general creditors; and (3) of the class of creditors referred to in the report, and hereafter described as the "Stock Exchange creditors." In support of the exceptions to the report filed by the claimant Mumford, no reasons were formally presented, and no authorities were formally cited to the court upon this motion. A careful consideration of that portion of the record which relates to the said claim clearly indicates that the claim was at the time of the assignment herein one of those unliquidated and unaccrued claims which were not provable and enforceable against the assigned estate. In support of this view and of the finding based thereon, the referee has fully cited all the existing authorities, has stated all the excepted reasons, and has omitted nothing essential to a proper determination of the matter. It simply remains, therefore, for this court, in following these authorities and adopting these reasons, to confirm the findings of the referee based thereon. The exceptions of the claimant Mumford to the report of the referee are therefore overruled, and the finding of the referee disallowing the claim of said claimant is therefore confirmed.

The main contentions arising upon this motion refer to the relative rights with respect to the distribution of the balance in the hands of the assignee (1) of the general creditors, whose interests are vigorously asserted by the assignee, as their trustee; and (2) of that class of creditors known as the "Stock Exchange Creditors" and consisting (a) of individual creditors who were also members of the New York Stock Exchange; and (b) of partnership creditors, one of whose members was also a member of the New York Stock Exchange. Briefly stated, and as shown by the established facts, the situation was as follows: At the time of the assignment herein the assignors constituted a copartnership for the transaction of a stockbrokerage business, and one of the members thereof, namely, Frederick W. Johnson,

one of the individual assignors herein, was then a member of the New York Stock Exchange, which is a voluntary, unincorporated association. Among the creditors of the assignors, as copartners and individuals, at that time, were those described in subdivisions "a" and "b" of class 2, as above stated. All of these creditors, as named in the referee's report, subsequently presented to the assignee, in response to his published notice, duly verified claims against the estate assigned herein for the full amounts then due and owing to them by the assignors. Subsequent to the said presentation by said creditors of their respective claims, the membership of the said assignor Johnson in the New York Stock Exchange was, in accordance with the constitution of that association, transferred, and the proceeds thereof were distributed by the committee named in the constitution for that purpose among the individual and copartnership stock exchange creditors of the assignors herein pro rata to the amounts of the respective claims of said individual and copartnership stock exchange creditors as liquidated and allowed by said committee. The result of that distribution was that all of said stock exchange creditors, both individual and copartnership, received 52 per cent. of the original amounts of their respective claims, as stated by them to the assignee. The matter now presented to the court for determination is the basis or amount upon which the distributive shares of the said individual and copartnership stock exchange creditors in the balance now in the hands of the assignee shall be computed. With reference to this question the assignee claims: First. That the firm or copartnership creditors of the assignors herein, one of the members of which firm or copartnership was also a member of the New York Stock Exchange, were not· "members" of the said exchange, and were not entitled to any share in the proceeds of the transfer of the membership of the individual assignor, Johnson, and that therefore they may now prove for the full amounts of their respective claims, but that the sums already received by them, respectively, from the committee of the exchange, must be deducted from all dividends declared or allowed them upon the present accounting of the assignee, and payable from the balance now remaining in his hands. This claim the referee overruled, to which finding the assignee excepted. Second. That all the stock exchange creditors, both individual and copartnership, who have resorted to and have received their pro rata shares of the proceeds of the transfer of the membership of the assignor Johnson, must deduct the amounts so received by them, respectively, from all dividends declared for or allowed them out of the general assets of the assigned estate, and payable from the balance now remaining in the hands of the assignee. This claim the referee also overruled, to which finding the assignee also excepted. Third. That in no event can any stock exchange creditor, individual or copartnership, who has received a share of the proceeds of the assignor Johnson's membership, receive out of the general assets of the assigned estate a dividend on a sum in excess of the original amounts of their respective claims, less the amounts respectively received by them from the said committee of the said exchange. This claim the referee sustained, to which finding the said creditors excepted. All of the many exceptions of the assignee as

filed in this court are embodied in his claims as above stated, and may and will be considered and determined in the decision of these claims without a specific enumeration and specific treatment thereof.

The first claim of the assignee, acting for the general creditors is based upon the two contentions: First, that by the constitution of the New York Stock Exchange, under the authority of which the membership of the assignor Johnson therein was transferred, and which, being assigned and accepted, formed the contract between the said assignor and his fellow members with reference to the rights and liabilities incident to said seat or membership, the right to share in the proceeds of the transfer of the membership of a member of the said exchange is confined solely to members thereof; and, second, that within the meaning and language of that constitution a partnership creditor of the assignors, a member of which partnership was also a member of the exchange, was not itself a member thereof. In support of this position the attention of the court is called to many and varied provisions of the constitution and rules of the exchange, stating the qualifications for membership, defining the qualifications, rights, and duties of officers and committees, providing for the disposition of the membership of a deceased member, and regulating the formation of partnerships by members, in all of which the word "member," used therein, can refer only to an individual. Of this there can be and is no doubt, and attention may therefore be given to other articles and sections of the constitution and rules. The important preliminary objections have been made to the claims of the assignee that, even assuming the assignee's position correct, as the amount of the claims of the individual creditors of the assignors who were also members of the stock exchange exceeded the proceeds distributed among creditors by the committee of that body, such individual creditors are alone entitled to that portion of the proceeds which the assignee claims was wrongfully paid to and received by copartnership Stock Exchange creditors, and such individual creditors have acquiesced in the distribution already made; and as the assignee and the estate, and general creditors thereof, could obtain no portion of said proceeds distributed by the committee, he and those whom he represents should not be heard to complain upon this accounting. This is true, and should be a sufficient answer to the claims of the assignee and of the general creditors, for whom, as trustee, he makes such claim. As, however, the amounts of the respective distributive shares of the members of the different classes of creditors in the balance now in the hands of the assignee might be affected by a failure to consider the question upon its merits, attention should now be given to those provisions of the constitution regulating the transfer of a membership in the exchange, and the distribution of the proceeds arising therefrom. These provisions are contained in article 13, entitled "Transfer of Membership," and article 14, regulating "suspended members, reinstatement, claims of creditors." So far as material to the issues under discussion, the sections of the former article permit: First, the transfer of membership by a member, after submission of the name of the proposed transferee to the committee of admissions, and after approval by two-thirds of that committee; second, the disposition by said committee of the

membership of a deceased member, and the payment to his legal representatives of any balance of the proceeds remaining "after paying the claims of the members of the exchange"; and, thirdly, the immediate disposition by said committee of the seat of a member deprived of his membership or declared ineligible for reinstatement, upon prior payment from the proceeds thereof of "all claims of members of the exchange against said membership." And the final section of said article declares that "all contracts, debts, or obligations, with or to members of the exchange, of a member who agrees to transfer his membership, shall become due and payable when notice of said agreement or transfer is posted upon the bulletin of the exchange, and shall be liquidated and paid, as allowed by the committee on admissions, out of the proceeds of said membership, upon consummation of the transfer thereof," and that "this law shall apply in every case where a membership is transferred by the committee on admissions." The sections of article 14 provide, under the penalty named in section 2, for written notice to the president, by an insolvent member or one failing to comply with his contracts, of his inability to meet his engagements, and the consequent suspension of such member until his settlement with "his creditors" and his reinstatement by the committee on admissions. Section 4 of this article provides for the disposition by the said committee of the membership of a suspended member on his failure to settle with his creditors within one year from the time of his suspension, or within the extended time allowed him, and for the application of the proceeds to the payment of his "debts in the exchange." Section 5 thereof uses the expression, "claims filed by other creditors who are members of the exchange." And the final section of said article requires the suspended member to file with the secretary a written list of his creditors on the exchange, and of the amounts owing to each. The facts here are that pursuant to article 14, § 1, the assignor Johnson was, on his notification of his insolvency, suspended; that before the expiration of a year from the time of his suspension he signed an agreement to transfer his membership in blank, the name of the transferee not being inserted therein; and that on the date of said agreement his membership was transferred. It does not clearly appear that the assignor, wishing to transfer his membership, submitted the name of a proposed transferee to the committee, or that, on the other hand, his transfer of membership in blank, and the delivery thereof to the committee, was merely formal, to enable the committee to dispose of the membership for the benefit of himself and creditors, although that the former is the case is indicated by the testimony of Secretary Ely. It is evident that, with respect to the facts of this case, the constitution is ambiguous or defective, in that it does not expressly provide for the distribution of the proceeds of the disposition of the membership of a member suspended for insolvency, who voluntarily agrees to transfer his membership. Article 13 refers solely to a "transfer of membership" of a member, without reference to his insolvency or suspension therefor, except in so far as the directions contained in section 5 may be said to be the result of suspension for insolvency, according to article 14, § 3, while article 14 relates to the reinstatement and claims of

creditors of suspended members. In the interpretation of the contract contained in the constitution, it is incumbent upon the court, without regard to the strict and rigid meaning of the general words or expressions used, to place itself in the situation of the parties, and to determine the meaning and intent of the language employed, from a consideration of the surrounding circumstances, of the occasion, and of the apparent object of the parties. Schoonmaker v. Hoyt, 148 N. Y. 425, 42 N. E. 1059; Gillet v. Bank, 160 N. Y. 549, 55 N. E. 292. It is also an elementary rule of law that in the construction of a constitution, statute, or contract, such a meaning should be given to each part of it as to give effect to all provisions of the instrument, provided violence is not done to the ordinary meaning of words. Assuming that he (the assignor, Johnson) could not and did not secure reinstatement by settling with his creditors within the period of one year from his suspension, or within such extension of time as might be allowed him, his membership would have been disposed of by said committee, and the proceeds applied to the payment of "his debts in the exchange," as allowed by said committee.

There is no reason indicated by the constitution, there is no reason suggested by the assignee, why, with respect to the classes of persons entitled to share in the distribution of the proceeds of the transfer of a membership, one rule should prevail in the case of the formal, voluntary agreement to transfer his membership by a member suspended for insolvency, and another rule should govern in the case of the disposition by the committee of admissions of the membership of a member whose insolvency and suspension continue beyond the time prescribed or allowed. On the contrary, not only does justice require that the same rule should prevail in both cases, but the constitution indicated that such was the intention of the parties. By the final provision of article 13, § 6, the law therein stated (that all debts "to members of the exchange of a member who agrees to transfer his membership" shall be liquidated and paid as allowed by the said committee out of the proceeds of said membership) is made applicable to "every case where a membership is transferred by the committee on admissions." Very well. One of the "cases" where a membership is transferred or disposed of by said committee is when, according to article 14, § 4, a member suspended for insolvency fails to settle with his creditors within one year from the time of his suspension, and in that case the proceeds must be applied "to the payment of his debts in the exchange, as allowed by said committee." How is effect to be given to the whole constitution, and to this specific provision thereof, unless we regard the phrases "debts to members of the exchange" and "debts in the exchange" as synonymous, and unless we suppose that the framers of the constitution intended them to be synonymous? Likewise, what could be the possible purpose or object of the requirement of article 14, § 7, of the submission to the said committee by a member suspended for insolvency of a written list of his "creditors in the exchange," unless it were for the accomplishment of the other object of the article,—the liquidation, allowance, and payment of these claims by the committee? Could the member, suspended for insolvency, by a voluntary formal agreement to transfer his membership, deprive

the committee of the right and power to allow and pay these claims from the proceeds of the transfer of such membership, or limit the claims provable against that membership to those of individual members of the· exchange? No; for in that event the committee could, under article 13, § 2, withhold its approval of the transfer until the expiration of the time specified in article 14, § 4, when it could itself dispose of the membership, and apply the proceeds to the payment of the member's "debts in the exchange." These deductions from the constitution are made to show its purpose and object, to emphasize the powers and duties of the committee on admissions, and to determine the rights and liabilities for the· enforcement of which those powers must be exercised and those duties must be performed. The defect or ambiguity in the constitution is explained in accordance with the views hereinbefore expressed by proof of the usage or custom of the stock exchange in the distribution of the proceeds of the sale or transfer of a seat or membership in the said exchange, and by proof of the practical construction put upon the contract contained in said constitution, with reference to the provisions in issue, by the signatory parties thereto. That the aid of such proof may be properly invoked in cases of this kind is evident from the authorities. As to usage or custom, see Walls v. Bailey, 49 N. Y. 464, 10 Am. Rep. 407; Collender v. Dinsmore, 55 N. Y. 200, 14 Am. Rep. 224; Smith v. Clews, 114 N. Y. 190, 21 N. E. 160, 4 L. R. A. 392, 11 Am. St. Rep. 627; Atkinson v. Truesdell, 127 N. Y. 230, 27 N. E. 844; Thomas v. Scutt, 127 N. Y. 133, 141, 27 N. E. 961; House v. Walch, 144 N. Y. 418, 39 N. E. 327; Boorman v. Jenkins, 12 Wend. 566, 573, 27 Am. Dec. 158; White v. Town of Ellisburg, 18 App. Div. 514, 45 N. Y. Supp. 1122; Neff v. Klepfer, 16 Misc. Rep. 49, 37 N. Y. Supp. 654. As to construction by parties, see Jacquin v. Boutard, 89 Hun, 437, 35 N. Y. Supp. 496; Snyder v. Seaman, 2 App. Div. 258, 37 N. Y. Supp. 696.

The usage must, of course, be uniform, reasonable, well settled, not in opposition to fixed rules of law, nor in contradiction of the express terms of the contract (Walls v. Bailey, supra), and the party to be bound must be shown to have knowledge or notice of its existence. It may be proved by one witness (Bissel v. Campbell, 54 N. Y. 353), and every fact is relevant which shows how, in particular instances, it was understood and acted upon by the parties then interested. Steph. Dig. Ev. (Chase's Ed.) pt. 1, p. 13, c. 2, art. 6. While in some instances the testimony of the officers of the exchange consists of mere conclusions, yet it does appear by these officers who, from their official positions, had personal knowledge of the facts to which they testify, and of the customs established by these facts, that, for very many years, in transacting business on the exchange no individual member who was also a member of a partnership was allowed to contract in his own name, but only in the name of his firm, and that for a similar period there has never been any distinction made by the committee on admissions, in distributing the proceeds of the transfer of the membership of a member of the exchange, between debts due individual members of the exchange and debts due firms or copartnerships one of whose members was also a member of the exchange. The knowledge on the·part of the assignors and of Johnson, the member of

the exchange, of this usage, their acquiescence in its operation, their practical interpretation of the contract of which it is made a part, are shown by the following facts: The assignors advertised themselves as "members of the exchange." Although a firm or copartnership, one of whose members (Johnson) was a member of the exchange, they presented to the committee on admissions their claim as a firm or copartnership against the membership of other members who were suspended for insolvency; and in the present case a list was furnished the committee on admissions of the creditors of the assignor and insolvent member, Johnson, after his suspension, which included not only individual members of the exchange, but also firms or copartnerships one of whose members was a member of the exchange. It is true that, of the parties contracting through the medium of the constitution, all of the individual creditors of the assignors who were members of the stock exchange were not shown to have knowledge or notice of the said usage or custom; but they have not objected or excepted to the distribution made in accordance therewith. Finally, the existence of the usage and the existence of knowledge or notice thereof are questions of fact, and in this case sufficient evidence was presented to the referee to warrant his findings thereon.

It was further contended that under the authority of Bernheim v. Keppler, 34 Misc. Rep. 321, 69 N. Y. Supp. 803, notwithstanding the general language of article 13, § 6, viz., "all contracts, debts, or obligations of every description," yet the said committee had jurisdiction only on claims arising from transactions in the exchange, i. e., claims arising on stocks, bonds, bullion, grain, or cotton on the exchange. This is a correct, and must be the accepted, statement of the law. The committee on admissions is a court of special or inferior jurisdiction (17 Am. & Eng. Enc. Law [2d Ed.] 1084), the jurisdiction of which, to support its judgment, will not be presumed, but must be affirmatively shown by jurisdictional facts (Beaudrias v. Hogan, 16 App. Div. 38, 44 N. Y. Supp. 785; Frees v. Ford, 6 N. Y. 176; Gilbert v. York, 111 N. Y. 544, 19 N. E. 268; Insurance Co. v. Rhoads, 119 U. S. 237, 7 Sup. Ct. 193, 30 L. Ed. 380; Neel v. Pennsylvania Co., 157 U. S. 153, 15 Sup. Ct. 589, 39 L. Ed. 654). The findings of the committee can be sustained only upon proof of—First, an investigation conducted upon bona fide notice; second, an opportunity to interested parties to be heard; and, third, a decision within the scope of the jurisdiction conferred upon the committee. Neukirch v. Keppler, 56 App. Div. 225, 67 N. Y. Supp. 710; Lewis v. Wilson, 121 N. Y. 284, 24 N. E. 474. The record clearly shows that the necessary notice and opportunity were given and afforded the parties entitled thereto. The testimony of the officer of the exchange who was present at the committee's meeting shows that the committee did distinguish between these claims of stock exchange creditors which were founded upon "stock exchange transactions" and those which were not, and the findings of the committee show a further distinction between claims founded upon transactions in stocks, bonds, and bullion, and upon those upon grain and cotton. The only facts presented to the committee to authorize the exercise of its jurisdiction in the premises may have been the admission of the assignor

Johnson, contained in the list of his creditors in the stock exchange, submitted by him, either personally or through the assignee, to the said committee; but these, especially in the absence of objection from the assignee, who, as the representative of the general creditors, had notice of the meeting and knowledge of the list, must be deemed competent and sufficient. For these reasons, all the exceptions of the assignee to the report of the referee, as embodied in his first claim, as above stated, should be, and are hereby, overruled; and the findings of the report on the matters thereby excepted to should be, and are hereby, confirmed.

The second contention of the assignee is evidently made upon the authority of In re Sawyer, 7 App. Div. 198, 40 N. Y. Supp. 294. The facts in issue in that case, and the essential portions of the opinion of the court thereon, are fully set forth in the referee's report, and need no repetition here. So far as material to the present controversy, the extent of the decision in that case, concisely stated, would seem to be that, on the distribution by a court of equity of this state of an insolvent estate among its creditors, the dividend of a foreign creditor presenting a claim to the assignee here, after having, subsequent to the execution of the assignment, but without actual notice of it, and before its registration in his state, attached portion of the assigned property in said foreign state, and after having received the proceeds thereof, must be reduced by the amount so received by it. Analyzed and briefly stated, the reasons for the said conclusion of the court are that in equity the assigned estate consists of what the assignor conveyed to the assignee by the terms and intention of the deed of assignment; that, both by the laws of this state and of the foreign state, the assigned estate so defined and so vested in the assignee included the property in the foreign state attached there by the foreign creditor; that the law of the foreign state permitted the foreign creditor, without actual notice, and before registration of the assignment, to withdraw and secure for itself, through the medium of an attachment, the portion of the assigned property situated in the foreign jurisdiction, and to apply the proceeds thereof to the payment of its debt; that with said attachment and sale, and with the legal rights acquired thereby, the courts of this state would not interfere, but that when, upon the subsequent distribution of the assigned property by a court of equity of this state, the said foreign creditor comes in by the presentation of a claim to the assignee as one of the cestuis que trustent under the assignment here, and seeks an equal share of the trust estate with other creditors here, it can have only an equal share of the entire estate, as that is recognized in equity, viz., the estate as defined and vested in the assignee by the assignment, which included the property attached in the foreign jurisdiction; and that therefore the said foreign creditor must abandon the preferences secured by its attachment, by making the estate whole so far as it has been depleted by said creditor, and by accepting such dividend as would be computed and allowed it upon the whole estate, including the property attached in the foreign state. In the present case, however, the stock exchange membership of the individual assignor, Johnson,—the fund from which the stock exchange creditors

were paid certain sums,—was not, at the time of the assignment, property of the assigned estate, and did not then vest in the assignee, in the sense that the attached property in the foreign jurisdiction was included and vested, as held in the Sawyer Case. The stock exchange membership of the assignor Johnson was an asset of the assigned estate herein, subject to the vested and existing contractual rights therein of the stock exchange creditors, as defined and conferred by the constitution of that association. The individual assignor could only and did only convey that membership to the assignee, by the assignment, subject to said contractual rights of said creditors, and thus only could and did the assignee receive it. At the time of the assignment the assignee could not, with respect to the said membership, perform any of the duties or exercise any of the powers imposed and conferred by the deed of assignment creating the trust. He could not take possession of it or sell it under the assignment. The assignor could not transfer or dispose of it in disregard of the rights therein of his fellow members on the exchange, because the committee on admission, the body charged by the constitution of the exchange with the enforcement of the contractual provisions contained therein, could, under article 13, § 2, withhold approval of the transfer and indorsement of the proposed transferee, until it was satisfied that the transfer was consistent with the rights of other exchange creditors, or until it could itself make such transfer under the provisions of article 14. With reference to the said membership, the most the assignor, the assignee, and the general creditors could expect at the time of the assignment, and could subsequently enforce, was the payment to the trustee of the assigned estate of any surplus remaining from the proceeds of the transfer of the membership of the assignor Johnson after the payment therefrom of the assignor's debts in the exchange, in accordance with the constitution of that body. Unlike the foreign creditor in the Sawyer Case, the stock exchange creditors have not, by any action subsequent to the assignment, depleted the assigned estate by withdrawing a portion thereof for their own use through the medium of a legal remedy to which they were entitled. They are only insisting upon their contractual rights, which were vested and existed at the time of the assignment, and subject to which the assignor conveyed and the assignee received the assigned property. There is no portion of the assigned estate to which the assignee was entitled under the deed of assignment of which he has been deprived by the said creditors, and which the said creditors can now, upon the present distribution, be asked to surrender. On the other hand, equity should not now compel the surrender of their contractual rights in the property of the assigned estate, vested and existing at the time of the creation of the trust, or the deprivation of anything acquired and received under those rights. For these reasons, the second claim of the assignee, "that in the distribution of the balance now in his hands, the dividends of the stock exchange creditors should be reduced by the amounts respectively received by them from the proceeds of the transfer of the membership in said exchange of the assignor Johnson," and the exceptions founded thereon, should be, and are hereby, overruled, and

the findings of the report thereon should be, and are hereby, confirmed.

There remains for disposition the third contention of the assignee, sustained by the referee, as above stated, that, on the distribution of the assigned estate upon this accounting, none of the stock exchange creditors who were entitled to receive and who did receive a share of the proceeds of the transfer of the assignor Johnson's membership can receive out of the general assets a dividend on a sum in excess of the amount of his claim as it existed at the time of the assignment, less the amount received by him from the stock exchange. While the rule stated in People v. E. Remington & Sons, 121 N. Y. 328, 24 N. E. 793, 8 L. R. A. 458, that in the distribution of an insolvent estate secured creditors are entitled to prove their claims against the estate, without regard to any collaterals they may hold, and to receive dividends for the amounts proved, is recognized by both assignee and referee, yet it is stated to be confined to cases wherein a creditor holds as security for his debt collaterals belonging to the debtor, wherein the creditor had same tangible security, which he himself could reduce to money on the maturity or default in payment of his claim, to pay the same, wherein, upon a breach of the contract by the debtor, the creditor could resort to a personal suit against the debtor for the full amount of his claim, and could resort also to the collateral securities, and wherein the creditor had a right in and to the security pledged or mortgaged, which he could either sell himself, or compel a third party to sell for his benefit. And the rule is declared to be inapplicable to the present case for the reasons that the stock exchange creditors held no collateral securities to which they could resort after the assignment; that they had no lien upon or rights in the assignor's membership; that they could neither sell it themselves, nor compel its sale by the assignor or the committee on admissions; that it remained subject to the control and power of disposition by the assignor for the time prescribed by the constitution or extended by the said committee; and that by the contract between the members of the exchange, contained in the constitution of that association, the only rights acquired and possessed by the stock exchange creditors herein were those of payment from or lien upon the fund or proceeds of the transfer of the membership, created five months after the assignment by the act of the assignor himself in voluntarily agreeing to transfer his membership. These distinctions are in some cases only partially correct, and in others of no force, as will be hereinafter more specifically pointed out. The conclusion of the court in the case of People v. E. Remington & Sons, supra, is founded upon the general principle that "the contractual relations of a debtor and his creditor remain unchanged, although insolvency has brought the general estate of the debtor within the jurisdiction of a court of equity for administration and settlement." So, too, in the same case, the lower appellate court said, "We think that the condition of the parties in relation to the insolvent's estate at the time it passed into the custody of the court should determine their respective rights." People v. Remington & Sons, 54 Hun, 505, 510, 8 N. Y. Supp. 34. And the same general guide is adopted in

the case of Merrill v. Bank, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640, wherein the court says at page 145, 173 U. S., page 366, 19 Sup. Ct., and page 640, 43 L. Ed., "Liens, equities, or rights arising by express agreement, or implied from the nature of the dealings between the parties, or by operation of law, prior to insolvency, and not in contemplation thereof, are not invalidated;" and at page 146, 173 U. S., page 366, 19 Sup. Ct., and page 640, 43 L. Ed., "The basis on which all creditors are to draw dividends is the amount of their claims at the time of the declaration of insolvency."

What were, then, the contractual relations prior to the assignment herein between the assignor Johnson and those of his creditors who were his fellow members on the stock exchange? What was the condition of the said parties at that time in relation to the assigned estate, and what, at that time, was the amount of the claims of the stock exchange creditors? By signing the constitution of the stock exchange, the assignor and the stock exchange creditors expressly agreed, according to article 13, § 6, and article 14, § 4, as hereinbefore construed, that, in the event of the voluntary transfer by the assignor Johnson of his membership, his debts in the exchange should become due and payable, and should be liquidated and paid, as allowed by the committee on admissions, out of the proceeds of the transfer thereof, and that in the event of the transfer of that membership, after Johnson's suspension for insolvency, by the said committee, the proceeds should be applied to the payment of said debts as allowed by said committee. At the time of acquiring their respective memberships there were no existing debts due from Johnson to the exchange creditors herein, respectively, to the payment of which the proceeds of the transfer of his membership were applicable, because said proceeds are applicable to the payment only of debts arising from stock exchange transactions in bonds, stocks, grain, cotton, and bullion, and no such transactions had then taken place. The memberships were simply acquired and accepted upon the express understanding that in the event of their transfer by a member or the committee the proceeds thereof should be applied to the payment of such debts as were then due and payable, as liquidated and allowed by the committee designated. Subsequently, however, such stock exchange transactions were had between Johnson and his fellow members in the exchange as to result in an indebtedness of the former to the latter. At that time these fellow members could have sued the assignor Johnson for the amount of their respective claims, i. e., they could rely upon and enforce the personal liability of their debtor. They also still had their contractual rights in his stock exchange membership, as expressed and conferred by the constitution. The debtor could not insist, as a condition precedent to the personal suit against him, that the creditors resort to a transfer of his stock exchange membership, nor could he plead or prove the existence of his creditors' contractual rights therein as a defense or counterclaim to the personal action against him. The most that he could do would be, by a voluntary transfer of his membership, with the approval of the committee on admissions, to reduce, as between himself and his said creditors, the amount of his indebtedness sued for or put in

judgment by them, respectively, by such pro rata shares of the proceeds of said membership as would be allowed said creditors by said committee. So that, as required by the case of People v. E. Remington & Sons, by the contract between Johnson and his fellow members the contractual rights of the latter in the membership of the former constituted a security additional to the personal liability of the debtor, upon which, in addition to said personal liability, the creditors could rely for the enforcement and collection of the full amount of their debts. It is true that it was neither a tangible, a negotiable, a convertible, nor a readily marketable security. It may have been weak. It may have been incapable of immediate collection or realization. But apart from its strength or value it was, in law, a security founded in the express contract of the parties, by which a particular item of property of the debtor was reserved for the prior payment of a particular class of debts. To say with the referee that the exchange creditors had no rights whatever in or to the membership of their debtor fellow member is erroneous, for, in the event of the debtor's personal inability to pay his debts in full, or to satisfy any judgment that might be recovered in the actions against him personally, his creditor fellow members could first, under article 14, § 1, of the constitution, insist upon his suspension, and could then, under section 4 of the same article, at the expiration of the time prescribed or granted, have insisted upon the transfer of his membership by the committee, and upon the application of the proceeds thereof to the payment of their debts. This, then, was the legal situation when Mr. Johnson, still owning the membership in the stock exchange, made the assignment herein individually and as one of the copartnership of assignors; and this continued to be the situation to the time when, in response to the assignee's published notice to do so, the stock exchange creditors presented to the assignee duly verified claims for the full amount of the indebtedness of the assignors to them respectively arising from transactions on the stock exchange. It is immaterial here whether we agree with the ruling in the Illinois cases cited and noted in the dissenting opinion in the case of Merrill v. Bank, supra, that the interest of a creditor in an assigned estate only vests in him when he signifies his assent to the assignment by filing his claim with the assignee, or with that of the Pennsylvania cases referred to in said decision, that under the statutes of that state the interest of such a creditor vests at the time of the transfer of the assets in trust; for in the present case it is admitted that both at the time of the assignment, and at the time of the presentation of the claims by the creditors, the amount of the indebtedness to the stock exchange creditors, respectively, was the same, and had not before either of said dates been reduced by the application of the proceeds of the transfer of the stock exchange membership of the assignor Johnson to the payment of said claims. If there had been a transfer of the membership of the said assignor, and an application of the proceeds thereof to the payment of his debts in the exchange, as allowed by the committee, prior to the time of the vesting of the interests of the stock exchange creditors in his assigned estate, then, of course, that application would have resulted in a reduction pro tanto of the

amount of his indebtedness to said creditors, respectively, and the extent of their vested interests as cestuis que trustent under the assignment; and the consequent basis for the computation of their dividends would have been the full amounts of their claims, less the amounts awarded them, respectively, from the proceeds of the transfer of the membership of their debtor fellow member. Such a state of facts might have brought the case within the authority of In re Sawyer, Wallace & Co., 33 App. Div. 300, 53 N. Y. Supp. 888, as explained by In re Bicknell, 31 Misc. Rep. 302, 64 N. Y. Supp. 360. But there was before that time no such transfer, application, payment, or reduction. By the execution and acceptance of the deed of assignment, or by the presentation of their duly verified claims to the assignee, the stock exchange creditors, along with the other creditors, acquired, as cestuis que trustent, a vested interest in the assigned estate of their debtor, the extent of which was the full amounts of their respective claims as they then stood. As between themselves and the other creditors, their fellow cestuis que trustent, they acquired and possessed this interest in the assigned estate, separate from and in addition to any right of recourse against the debtor personally for the amounts of their respective debts, and any liens, equities or contractual rights that they had, through their vigilance or otherwise, previously acquired in any particular asset or portion of the debtor's property. Subject to the general rule that dividends and the right to retain securities must cease when, from the securities and the dividends, the secured creditors have been paid in full, their rights and the extent of their interests as cestuis que trustent under the assignment could not be affected by any receipts or collections from or realization upon their separate liens, equities, or contractual rights, subsequent to the vesting of their interests in the assigned estate, nor were their rights under the latter affected by their interest under the assignment. These distinct and separate legal and equitable rights or interests the learned referee has failed to recognize. Thus the United States supreme court, in Merrill v. Bank, supra, says at page 136, 173 U. S., page 363, 19 Sup. Ct., and page 640, 43 L. Ed.:

"Assets of an insolvent debtor are held under insolvency proceedings in trust for the benefit of all his creditors, and a creditor, on proof of his claim, acquires a vested interest in the trust fund; and, this being so, the rule that the creditor can prove for the whole amount, but shall receive dividends only on the amount due him at the time of distribution of the fund, must be rejected, as it is based on the denial, in effect, of a vested interest in the trust fund, and concedes to the creditor simply a right to share in the distributions made from that fund according to the amount which may then be due him, requiring a readjustment of the basis of distribution at the time of declaring every dividend, and treating (erroneously, as we think) the claim of the creditor to share in the assets of the debtor, and his debt against the debtor, as if they were one and the same thing."

At page 138, 173 U. S., page 363, 19 Sup. Ct., and page 640, 43 L. Ed., the court states the general principle as follows:

"The creditor's right to dividends is based on the amount of his claims at the time his interest in the assets vests by the statute, or deed of trust, or rule of law, under which they are to be administered."

So, also, at page 140, 173 U. S., page 364, 19 Sup. Ct., and page 640, 43 L. Ed., the court says:

"Certainly the giving of collateral does not operate of itself as a payment or satisfaction either of the debt or any part of it, and the debtor, who has given collateral security, remains debtor, notwithstanding, to the full amount of the debt." Citing on this point Lewis v. U. S., 92 U. S. 618, 623, 23 L. Ed. 513.

At page 145, 173 U. S., page 366, 19 Sup. Ct., and page 640, 43 L. Ed., the court specifically declares that equities or rights arising by express agreement between the parties prior to insolvency, and not in contemplation thereof, are not invalidated by the assignment. And the distinction between the two separate interests of the creditors having liens, equities, or contractual rights in any particular portion of the debtor's property is recognized, and the right of said creditors to resort to both sources for the full payment of their claims is enforced, by the following language at page 138, 173 U. S., page 363, 19 Sup. Ct., and page 640, 43 L. Ed.:

"As the trust created by the transfer of the assets by operation of law or otherwise is a trust for all creditors, no creditor can equitably be compelled to surrender any other vested right he has in the assets of his debtor in order to obtain his vested right under the trust."

The claim of the creditor to share in the assets of the debtor and his debt against the debtor are, then, entirely distinct and separate rights; and the only effect of the voluntary transfer by the assignor Johnson of his stock exchange membership, five months after the assignment, and of the application of the proceeds thereof to the payment of the assignor's debts in the exchange as allowed by the committee on admissions, was, as between the assignor and his creditor fellow members, to reduce the amount of the indebtedness of the former to the latter, respectively, at that time, as between the stock exchange creditors and the other creditors, their fellow cestuis que trustent under the assignment, said transfer and application of proceeds could have no effect upon the distribution of the assigned estate other than that contained in the general rule above stated, that the stock exchange creditors were not entitled to receive from the proceeds of the membership and from dividends more than the full amounts of their claims. Thus the United States supreme court, in the case above frequently cited, says at page 140, 173 U. S., page 364, 19 Sup. Ct., and page 640, 43 L. Ed.:

"Doubtless the title to collaterals pledged for the security of a debt vests in the pledgee so far as necessary to accomplish that purpose, but the obligation to which the collaterals are subsidiary remains the same. The creditor can sue, recover judgment, and collect from the debtor's general property, and apply the proceeds of the collateral to any balance which may remain. Insolvency proceedings shift the creditor's remedy to the interest in the assets. As between debtor and creditor, moneys received on collaterals are applicable by way of payment; but, as under the equity rule the creditor's rights in the trust fund are established when the fund is created, collections subsequently made from, or payments subsequently made on, collateral, cannot operate to change the relations between the creditor and his cocreditors in respect of their right in the fund."

For the acceptance of the reasoning in the prevailing opinion in the case of Merrill v. Bank, supra, we have the authority in this state of the case of People v. E. Remington & Sons, 121 N. Y. 328, 24

N. E. 793, 8 L. R. A. 458, specifically referred to by Mr. Justice White, in his dissenting opinion, as typical of the cases which decide that "to allow the creditor to prove for his whole claim without any deduction of security is not incompatible with ratable distribution, and which hold that the security need not be taken into account." And it is worthy of note that one of the justices of the United States supreme court, concurring in its prevailing opinion in the former case, was a member of the court of appeals in this state which rendered the decision in the latter case. As stated on page 334, 121 N. Y., page 794, 24 N. E., and page 458, 8 L. R. A., the principles upon which the decision in the Remington Case was founded were, substantially, that by the contract between the debtor and the creditor the security given by the former to the later was additional to the personal liability of the debtor; that the debtor had no control over the application of the collaterals, and could not compel the creditor to resort to the collaterals before personal suit; that, on the other hand, the creditor was not bound to apply his collateral securities before enforcing his direct remedies against the debtor, but could rely upon both classes of rights until his debt was finally paid; that the insolvency of the debtor did not affect the contractual rights; that the court could not change them; and that equity required that they be recognized and enforced. In support of this view are the rulings in the following cases in this state: In re Ives (Sup.) 11 N. Y. Supp. 650, 655; In re Simpson, 36 App. Div. 562, 55 N. Y. Supp. 697, affirmed in 158 N. Y. 720, 53 N. E. 1132; In re Snyder, 29 Misc. Rep. 1, 59 N. Y. Supp. 993; In re Bicknell, 31 Misc. Rep. 302, 64 N. Y. Supp. 360; Benecke v. Haebler, 38 App. Div. 344, 58 N. Y. Supp. 16, affirmed in 166 N. Y. 631, 60 N. E. 1107; In re Binghamton General Electric Co., 143 N. Y. 261, 264, 38 N. E. 297. And see, for a complete review of all the authorities in the United States, and as the precedent for the decision of the court in the Merrill Case, supra, the case of Bank v. Armstrong, 8 C. C. A. 155, 59 Fed. 372, 28 L. R. A. 231. The present case is not identical with that of In re Sawyer, Wallace & Co., 33 App. Div. 300, 53 N. Y. Supp. 888, strenuously insisted upon by the assignee, and relied upon by the referee, in support of the findings of the report upon the point in question, and that case is not authority for the determination of the issues raised herein. As stated by the court itself in that matter, it was not a case where the creditor held securities which the debtor had given to it as further security, or where the creditor had acquired any double security from the principal debtor, but where the creditor had received money to apply upon its debt from one who is, in the last resort, bound for its payment. The court in that case says, substantially, at page 305, 33 App. Div., and page 891, 53 N. Y. Supp., that the banking company (the creditor) relied upon Sawyer, Wallace & Co.'s (the debtor assignors') personal responsibility for its protection. So far as the tobacco was concerned, there was no contractual relation between them by which Sawyer, Wallace & Co. gave to their creditor two remedies for their debt. The creditor secured additional security by interfering with the contract between Sawyer, Wallace & Co. and Skeldon, a third person, and adopted it so far as to make

Skeldon's property first liable for the debt, and took that property, to the possession of which Sawyer, Wallace & Co. were first entitled as security on the draft, and applied it to an original payment, instead of a repayment of Sawyer, Wallace & Co.'s secondary liability. The case is not one where the creditor holds security given to him by the debtor for additional protection, but it is a case where the creditor, asserting an equitable right not the result of contract, has procured the property of a third person, not the debtor, to be applied to the payment of his debt, to the detriment of the debtor. Furthermore, the operation of the rule stated in Re Sawyer, Wallace & Co., supra, has by In re Bicknell, 31 Misc. Rep. 302, 64 N. Y. Supp. 360, been confined to cases wherein the application of the proceeds of the sale of the property held as security, and the consequent partial payment of the creditor's claim, were made prior to the vesting of the interest of the creditor in the assigned estate of his debtor by the execution of the deed of assignment, or the presentation of a duly verified claim to the assignee. Nor is the present case identical with that of In re Atwood, 3 App. Div. 578, 38 N. Y. Supp. 338, which is cited in support of the finding of the referee, and in which a factor, to whom goods had been consigned, and who had made advances upon the credit thereof, sought to prove, upon the distribution of the assigned estate of his principal, for the full amount of the principal's indebtedness to him at the time of the assignment for said advances, without deduction therefrom of the proceeds received by the factor from the sale of the consigned goods after the assignment. This, it was held, he could not do; but the ruling proceeded upon the theory that in that case, unlike People v. E. Remington & Sons, there was primarily, because of the peculiar nature of a factor's "advance," and under the peculiar arrangement existing between the parties, no debt owing for which the property was held as collateral. It was held that, because of the nature of the contract between the parties, there was, as of the time of the vesting of the interest of the factor creditor in the assigned estate of his debtor principal, no debt, or no amount of debt, of which the former could make proof; and whether or not there would be any debt could not be known until, according to the agreement of the parties, there had been a sale of the consigned goods. That the decision is based upon the peculiar nature, in law, of a factor's "advance," and that the operation of the rule stated in that case must be confined to such peculiar contracts, is evident from the language of the court at page 580, 3 App. Div., and page 340, 38 N. Y. Supp.:

"The authorities cited * * * show that, under such an arrangement as existed between these parties, resort must first be had to the fund or the consigned property for the payment of any advances made, before the principal can be made liable, and that it is incumbent upon the factor to show the fund to be insufficient to repay the advances, before a recovery can be had against the consignor personally. * * * An advance is something which precedes. * * * As applied to the payment of money, the term implies that the parties look forward to a time when the money will be due to the recipient. * * * An advancement by the factor * * * is a prepayment,—a mere anticipation of the avails of the goods consigned,—and no more creates a debt in the first instance than an advancement of a father to his son in anticipation of his expected inheritance creates a debt."

While it is true that in the present case at the time of the execution by the assignor Johnson and his fellow members of the contract contained in the stock exchange constitution there was then no debt due the latter from the former, yet the contractual relation between them with reference to the membership of the former was not identical with that existing between a principal and a factor with reference to goods consigned by the former, and advances made by the latter on the credit thereof; and in the present case there was at the time of the vesting of the interest of a stock exchange creditor in the assigned estate of the assignor a debt, definite in amount, and capable of certain, accurate proof, for which the creditor could make claim, which was not affected by the existence of any other contractual rights in favor of the creditor, and which, prior to that time, had not been reduced by any enforcement of, or realization upon, such contractual rights. It is obvious here that the exchange creditor could not be compelled to resort first to the membership of his debtor fellow member, before holding him or his estate liable, as in the Atwood Case the factor was compelled to resort first to the fund or the consigned property for the payment of his advances before he could hold the principal; for suppose, in the present case, that, as provided by the constitution, the assignor Johnson had not up to the present time transferred his membership, that the proceeds thereof had not been applied to the payment of his debts in the exchange, but that Johnson still continued suspended and his membership untransferred. Under those circumstances could it be properly said that, upon the distribution at the present time of the assets of the assigned estate, the exchange creditors could not make proof of the full amounts of their claims against the debtor and his estate, but must be asked to make what they could not make, or asked to enforce what they could not enforce, viz., a transfer of their debtor's membership, or must be compelled to wait for such transfer, and to apply at that time their pro rata shares in the proceeds thereof in reduction of the amounts of their respective claims? I think not. But whatever the doubt indicated by the decision in Re Atwood, supra, it must be resolved in favor of the stock exchange creditors herein, in view of the authority of People v. Granite State Provident Ass'n, 161 N. Y. 492, 55 N. E. 1053. In that case was involved substantially the question of the respective rights of resident and nonresident creditors and shareholders of a foreign banking corporation in the general assets of the corporation, and in the special deposit of security made in this state by the corporation as a condition precedent to its rights to transact business here; and it was there held, on the authority of People v. E. Remington & Sons, supra, that such directions to the trustee by the court were proper and necessary, as would insure to the resident creditors the right both to receive the benefit of the special fund deposited in this state, and also to prove their claims against the general assets for the full amounts thereof. In that case the court says at page 496, 161 N. Y., and page 1055, 55 N. E.:

"The defendant, in order to acquire the right to transact its business in this state, was obliged to make this deposit, since the statute so provides. If this was a deposit as security merely for domestic creditors, we would be

inclined to agree with counsel for defendant, who insists that this fund should be devoted to the benefit of all creditors equally, wherever residing. But it is something more than a mere deposit as security. It is in the nature of a fund held in trust for the benefit of domestic creditors and shareholders of the defendant."

From sections 14 and 33 of the banking law (Laws 1892, c. 689), it appears that the securities deposited—

"Were held by the superintendent as a trustee for domestic creditors and shareholders. The defendant corporation, in making the deposit, must be deemed to have consented that in case of insolvency the fund might be distributed according to the terms of the statute, i. e., to creditors and shareholders residing in this state. So that by the act of the corporation itself in availing itself of the benefit of the statute it has devoted this fund to the benefit of the domestic creditors and shareholders, at least so far as to enable them to receive payment upon all their obligations in full."

So, in the present case, the assignor Johnson, by signing the constitution of the stock exchange, must be deemed to have expressly contracted that in the event of the voluntary transfer of his membership, or in the event of its transfer after his suspension for insolvency, the proceeds thereof must be distributed according to the terms of the constitution,—that is to say, to the payment of his debts in the stock exchange,—and that by this act, in accepting and acquiring the benefit of a membership in the stock exchange, he has devoted this fund to the benefit of his creditor fellow members in the exchange, at least so far as to enable them to receive payment of their claims in full. And the committee on admissions of the stock exchange was the body of trustees, created by the constitution, for the recognition and enforcement of the contractual rights conferred by that instrument. By the exercise of their power of approval or disapproval of the proposed transfer, in the case of a voluntary disposition of a membership by a member, and by the exercise of their right to transfer a membership in case of the continued suspension of a member for insolvency, and by the exercise of their jurisdiction in liquidating and allowing the claims of exchange creditors against said membership, and of paying the same from the proceeds thereof, they were, as trutees, invested with the power of control and management of the trust property, the membership, and charged with the duty of making or enforcing the application of the proceeds thereof to the payment of the debts declared due and payable by the constitution, and proved to their satisfaction. It is briefly indicated by the learned referee, and vigorously contended by the assignee, that if the contractual relations between the assignor Johnson and his creditor fellow members upon the exchange must be recognized and enforced, unaffected by the insolvency of the former, yet, under the constitution of the stock exchange, the only contract between the parties was that, in the event of the voluntary transfer of his membership by the former, his debts in the exchange should then become due and payable, and should be liquidated and paid, as allowed by the committee on admissions, out of the proceeds of said membership, upon the transfer thereof. The learned referee evidently attaches some legal significance to the use of the words "liquidated and paid," though what it is difficult to see. That, in a determination of the present issues, the use of these words

possesses no decisive significance, is evident from the fact that this provision is part of the agreement in every collateral note and mortgage, and so must have been before the courts in the many cases above cited involving the rights of the holders of such evidences of indebtedness. The question for the determination of the court upon this accounting is the basis of dividends, dependent upon the ascertainment of the quantum of interest of the creditors in the assigned estate at the time their rights as cestuis que trustent became vested therein. That quantum of interest, that basis of dividends, was the full amount of the claims of which they have made proof therein. The "liquidation" by the committee on admissions, five months after the assignment, of the claims of the stock exchange creditors against the membership of the assignor Johnson, was a final adjudication, within the jurisdiction of the committee, of the transactions between the assignor and his creditor fellow members of the respective and relative rights of the latter in the membership of the former; and that "payment" made by the committee to the stock exchange creditors constituted a payment pro tanto of the claims of the latter, as between them and their debtor fellow member of the assignor Johnson, and did not affect in any way the rights of said creditors as cestuis que trustent under the assignment.

For these reasons, the exceptions of the stock exchange creditors to the failure of the referee to allow their claims in full, as presented to the assignee, should be, and are hereby, sustained, and the referee's report should be, and hereby is, modified accordingly, and the said claims should be, and are hereby, allowed as so filed, and the dividends of said creditors should be, and are hereby, directed to be computed and paid upon the basis of the amounts of said claims, as so filed and allowed, subject to the exception that no stock exchange creditor can receive any sum, as dividend, in excess of the balance due him upon the full amount of his original claim after the deduction therefrom of the amount already paid him from the proceeds of the stock exchange membership of the assignor Johnson.

Ordered accordingly.